UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDUARDO DUARTE,<br><br>　　　　　　Petitioner,<br><br>v.<br><br>TIMOTHY BUSBY, Warden<br><br>　　　　　　Respondent. | Case No. 12-CV-969-BEN-PCL)<br><br>**REPORT AND RECOMMENDATION:**<br><br>**DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>[Doc. No. 1] |

PETER C. LEWIS, United States Magistrate Judge.

　　　This Report and Recommendation is submitted to the Honorable Roger T. Benitez, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 72.1(d)(4) of the United States District Court for the Southern District of California.

## I.

## INTRODUCTION

　　　On April 18, 2012, Eduardo Duarte "Petitioner", a state prisoner proceeding pro se, filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging his conviction imposed by the San Diego Superior Court in case

number SCS 218717. [Doc. No. 1.] Petitioner was sentenced to fifteen years to life after being convicted of second degree murder (Cal. Penal Code § 187(a)) and misdemeanor cruelty to a child by endangering the child's health (Cal. Penal Code § 273(b)). (Lodgment 7 at 500-14.) In his Habeas Petition, Petitioner presents four claims stemming from his trial in superior court: prosecutorial misconduct; ineffective assistance of trial counsel; unlawful interrogation; and ineffective assistance of appellate counsel. [Doc. No. 1 at 3.]

This case is before the undersigned Magistrate Judge under S.D. Cal. Civ. R. 72.1(d)(4) for Proposed Findings of Fact and Recommendation for Disposition. For the reasons set forth below, this Court respectfully recommends that the Petition be **DENIED**.

## II.

## FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); see also Summer v. Mata, 449 U.S. 539, 550 (1981) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The following facts are taken verbatim from the California Court of Appeal's opinion:

### History

Duarte began dating Ana Valdez in 1999. The two eventually moved in together with Valdez's four children. In 2005 the couple had a son. In 2006, Valdez and Duarte broke up, and Duarte moved out of the apartment that they had been sharing. In December 2007, Valdez began dating Gabriel Ojeda.

### April 11, 2008: The Fatal Altercation

On the morning of April 11, 2008, at approximately 6:30 a.m., Valdez woke up her 12-year-old daughter, K.R., for school. Ojeda and J.R., Valdez's 17-year-old son, were also present in the apartment that morning. Duarte arrived at the apartment to drop off the couple's son with Valdez before going to work, which he often did.

K.R. was in the bathroom when she heard Duarte and Valdez 'yelling.' K.R. came out of the bathroom and went into the kitchen. From her vantage point in the

2

kitchen, K.R. could see Duarte and Valdez on the balcony of the apartment. K.R. saw Duarte use "both arms" to push Valdez on her chest, causing her to go over the balcony railing and fall to the ground below. Valdez screamed as Duarte pushed her and tried to hold onto the balcony railing with one hand. However the force of Duarte's push lifted Valdez up and over the railing.

K.R. ran downstairs to Valdez. Valdez could not speak. K.R. saw Duarte walk down the stairs, talking on his cellular telephone. According to K.R., Duarte appeared to be 'upset' and '[l]ike mad.' Valez's son, J.R., came down stairs to the parking lot and began to argue with Duarte. Duarte pushed J.R. away.

Ojeda was sleeping during the argument between Valdez and Duarte, and during Valdez's fall form the balcony. After Valdez's fall, J.R. banged on the bedroom door to get Ojeda. When Ojeda responded, he saw J.R. on the telephone. J.R. was crying and saying "my mom, my mom." J.R. then rushed downstairs, and Ojeda followed him. Ojeda saw Valdez lying in the parking lot, and noticed Duarte standing near Valdez, holding Valdez and Duarte's son. Duarte looked at Ojeda, tapped the back of his own head, and told Ojeda that he was "next."

## Subsequent Events

At the time of the incident, Faustino Gutierrez, a teacher at a nearby school, was standing in the school parking lot talking with Elmer Harlow, a school custodian. The apartment complex was approximately 40 yards away from where Guiterrez and Harlow were located. Gutierrez heard a woman who sounded upset. As he turned in the direction of the voice, he saw a man throwing something off the balcony of an apartment. Gutierrez called 911 once he realized that the object that had been thrown off the balcony was a body, and not, as he originally believed, a blanket or a 'large rug.' Gutierrez later saw the man who had thrown the person over the balcony carrying a child in his arms, pacing.

San Diego Police Officer William Hernandez was the first police officer to arrive at the scene. He found Valdez lying on the ground, unresponsive, and bleeding from the back of her head. Ojeda told Hernandez that Duarte had pushed Valdez off of the balcony. When Hernandez asked Duarte if this was true, Duarte responded by telling Hernandez that Ojeda was the one who had pushed Valdez off of the balcony. J.R. jumped into the conversation and began to argue with Duarte. As Duarte walked away from J.R., Duarte told Hernandez that he wanted to confess. Duarte then told Hernandez that he pushed Valdez off the balcony "because she didn't want anything to do with him anymore." After Duarte made this statement, Hernandez placed Duarte in handcuffs and detained him until detectives arrived. When paramedics arrived at the scene, they found "an unresponsive patient that was on the ground." Paramedics transported Valdez to the University of California San Diego Medical Center, where she was placed on life support and a ventilator system. Valdez was determined to be brain dead four days later, on April 15, 2008. The following day, she was taken off life support and died.

## Interrogation

Detective Robert Meisner interviewed Duarte at the police station. Duarte waived his *Miranda* rights, and told Meisner that he "did a horrible thing," and that "there has been like rage in my. . . mind." Duarte explained that he and Valdez had broken up approximately a year and a half before the incident. According to Duarte, sometime in the past two weeks he learned that Valdez had a new boyfriend, but she seemed to be hiding the new boyfriend from him. That morning,

3

he went to Valdez's apartment to drop off their son. Although he had no intention of starting a fight with Valdez, when he saw her, he asked her if she would give him another chance, and became "super angry" when Valdez told him that their relationship was over. He put their son on the sofa, and then "kinda like shoved" Valdez over the balcony. He explained that "everything was really fast." Duarte said that Valdez had been facing with her back towards the balcony railing when he put one hand on her shoulder and another hand on her leg and lifted her over the railing. Duarte admitted that he lied when he told an officer at the scene that Ojeda was the one who had thrown Valdez off the balcony.

**Testimony of coworkers**

Terry Zinter, a coworker of Duarte's, had known Duarte for just over a year. Zinter knew that Duarte and Valdez had a child together, that they had broken up, and that Valdez had been dating someone else. Duarte first mentioned the fact that Valdez was dating another man approximately a month before the incident. It appeared to Zinter that Duarte was bothered by the fact that Valdez was seeing someone else. Zinter testified about a discussion he had with Duarte in which Duarte seemed angry that Valdez had a new boyfriend: "One time when he seemed bothered that you know, she had this boyfriend . . . he said something about, you know, he wished he had a gun, that he would shoot her in the pussy. He said he didn't want to kill or hurt her, he just wanted to hurt her so she would suffer." After Duarte made this statement, he laughed and said he was just kidding. However, Zinter was left with the impression that Duarte was upset that Valdez was dating someone else.

Guillermo Betancourt, another of Duarte's coworkers, testified that he had known Duarte for approximately three months prior to the incident. According to Betancourt, Duarte appeared "really stressed" about his relationship with Valdez. Duarte told Betancourt that Valdez was dating someone else, and appeared angry and upset about it. When asked whether Duarte had ever mentioned wanting a gun, Betancourt testified that Duarte had told him that "he would like to have a gun."

A third coworker, Kevin Severns, testified that he had known Duarte for approximately a year and a half prior to the incident. Severns estimated that about a month before the incident, Duarte indicated that he was upset about the fact that Valdez appeared to be ending their relationship "for good."

**Defense's case**

Duarte testified at trial. He confessed to having killed Valdez, but claimed that the reason he had pushed Valdez was because she was blocking his path.

Duarte testified that he had known about Valdez's new boyfriend for approximately two weeks before the incident, but that he had been surprised to find another man sleeping in Valdez's bed when he arrived to drop off their son. Duarte explained that when he said to Valdez, "You're not coming back to me," she told him, "I don't need you anymore, idiot." Duarte felt hurt, insulted and "somewhat angry." Duarte wanted to leave, but Valdez was standing in the doorway, obstructing his exit. Duarte said that he pushed Valdez in the chest, and she fell backward, toward the balcony railing. Valdez refused to move, so he pushed her harder, and she went over the railing.

Duarte testified that he was so upset at the time that he could not remember whether he had just pushed Valdez, or whether he had lifted or thrown her over the railing. He testified at trial that he believes he only pushed Valdez, and that he did

4

not throw her over the railing.

After Valdez went over the railing, Duarte grabbed their son and went downstairs. He called the police to help. Duarte remembered telling Ojeda that Ojeda was next, but said that he did not remember what he meant by that.

(Lodgment 7.)

## III.

## PROCEDURAL BACKGROUND

On April 18, 2008, the San Diego District Attorney filed an amended complaint charging Petitioner with the following: Count 1- murder (Penal Code § 187(a)); Count 2 and 3-child abuse (Penal Code § 273(a)); Count 4-making a criminal threat (Penal Code § 422). (Lodgment 1 at 4.) On December 15, 2008, a jury found Petitioner guilty of second degree murder (Count 1) and endangering the health of a child (Count 2). (Id. at 115-16.) On January 14, 2009, the trial court sentenced Petitioner to fifteen years to life in state prison. (Lodgment 3 at 657.) Also, the court denied probation and gave the Petitioner 279 days credit for time already served. (Id. at 658.).

On August 21, 2009, Petitioner sought appeal with the California Court of Appeals from the decision of the Superior Court of San Diego. (Lodgment 4.) On March 7, 2010, the California Court of Appeals affirmed the ruling of the trial court. (Lodgment 7.) Petitioner then filed a "Petitioner for Review to Exhaust State Remedies" in the Supreme Court of California on May 7, 2010. (Lodgment 8.) On July 14, 2010, Petitioner appealed the court of appeal's decision to the Supreme Court of California, which subsequently denied the review. (Lodgment 9.)

Petitioner filed a state Petition for Writ of Habeas Corpus in San Diego Superior Court on April 25, 2011, with the following contentions: prosecutorial misconduct; ineffective assistance of counsel at the trial level; unlawful interrogation; and ineffective assistance of counsel at the appellate level. (Lodgment 12 at 4, 18, 28, and 38.) On May 5, 2011, the superior court denied Petitioner's Habeas Corpus Petition. (Lodgment 13.) Petitioner appealed this

decision to the California Court of Appeals on June 8, 2011. (Lodgment 14.) On July 14, 2011, the court of appeals denied the petition. (Lodgment 15.) On August 15, 2011, Petitioner sought review with the Supreme Court of California which also denied his Petition without comment. (Lodgment 16 and 17.)

Petitioner filed this instant Petitioner for Writ of Habeas Corpus on April 12, 2012 asserting the following: prosecutorial misconduct; ineffective assistance of counsel at the trial level; unlawful interrogation; and ineffective assistance of counsel at the appellate level. [Doc. No. 1 at 8, 24, 35, and 46.] Timothy Busby, "Respondent" filed his response to Petitioner's Habeas Petition on August 17, 2012. [Doc. No. 11.] The Court granted both of Petitioner's requests for extensions of time to file a Traverse on September 20, 2012 and on October 17, 2012. [Doc. No. 14 and 17.] On December 6, 2012, Petitioner filed a Traverse. [Doc. No. 18.]

## IV.

## DISCUSSION

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 "AEDPA" applies to habeas corpus petitions filed after 1996. Lindh v. Murphy, 521 U.S. 320, 336 (1997). As amended by AEDPA, 28 U.S.C. section 2254(d) precludes a federal court from granting an application for writ of habeas corpus on behalf of a person in state custody with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Woodford v. Visciotti, 537 U.S. 19, 24–26 (2002); Early v. Packer, 537 U.S. 3, 8 (2002).

A federal habeas court may grant relief under the "contrary to" clause if the

state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. Bell v. Cone, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. Id. Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. Harrington v. Richter, 131 S. Ct. 770, 786 (2011). An unreasonable application of federal law is different from an incorrect application of federal law. Harrington, 131 S. Ct. at 786. A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. Id. (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Thus, AEDPA sets an intentionally high bar, which must be overcome before a district court may grant a writ, and even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. Id. AEDPA stops just short of imposing a complete bar on federal court litigation of claims already rejected in state proceedings, preserving a federal court's authority to issue the writ only where "there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. Habeas Corpus is not a substitute for ordinary error correction through appeal, but rather, "is a guard against extreme malfunctions in the state criminal justice systems." Id. (citing Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).

Where, as the case here, there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801–06 (1991) ("[W]here there has been a

reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim rest on the same ground.") The last reasoned denial of Petitioner's claims was in the superior court. (Lodgment 13.)

### B. Analysis

Petitioner raises four grounds for relief in his Petition. In ground one, Petitioner claims prosecutorial misconduct asserting that prosecutors deliberately misled the jury throughout the entire trial and "performed in such a way to cause the jury to deliberate with sympathy for the victim and her siblings." [Doc. No. 1 at 8.] In ground two, Petitioner claims that defense trial counsel was ineffective and "failed to establish a reasonable defense of any kind." (Id. at 24.) In ground three, Petitioner claims that his post arrest interrogation was unlawful because he was "mentally insane, and not competent to invoke his Miranda rights to counsel." (Id. at 35.) In ground four, Petitioner claims he received ineffective assistance of counsel on direct appeal because he "refused to raise all potential motorius claims, in order to avoid compromising his relationship with other judicial officials and other attorneys." (Id. at 46.)

**1. Prosecutorial Misconduct Claim**

In ground one, Petitioner alleges that prosecutors in his case engaged in misconduct by misleading the jury with false evidence. [Doc. No. 1 at 8.] Petitioner asserts that prosecutors caused the jurors to "draw false inferences" regarding Petitioner's language and ability to comprehend, educational background, and character for truthfulness. (Id.) Petitioner states that prosecutors led the jury to believe that Petitioner spoke perfect English because he attended University of California- Davis, presented comments made by the Petitioner that painted him in an unfavorable light, and accused him of "fake crying" during trial. (Id. at 9.) Petitioner claims that had these instances of "misconduct" not occurred it's probable that Petitioner's trial would have turned out differently and in Petitioner's

favor. (Id.)

The appropriate standard of review for prosecutorial misconduct is a narrow one of due process. Darden v. Wainwright, 477 U.S. 168, 181 (1986). In Darden, the Court stated that a defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Darden, 477 U.S. at 181. A petitioner seeking the writ of habeas corpus will not succeed merely because the prosecutors' actions "were undesirable or even universally condemned." (Id.) Rather, to successfully state a claim for habeas relief based upon comments at trial by the prosecutor, a petitioner must show that the prosecutor's comments were so egregious that they fatally infected the proceedings, rendered the entire trial fundamentally unfair, and made the conviction a denial of due process. (Id.)(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Further, "[S]tatements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young, 470 U.S. 1, 11 (1985).

In this case, despite Petitioner's claim of prosecutorial misconduct, there is scant evidence in the record to support a finding that prosecutors' statements during trial rendered Petitioner's trial "fundamentally unfair."

Rather than point to fundamental injustices, Petitioner's complaints hinge on minor discrepancies and personal opinion. For example, petitioner claims that during trial prosecutors misled the jury when they stated he had a high school and college degree and therefore comprehends and speaks better than he lets on because he only did "reasonable" in high school and flunked out of college for failure to keep up his grades. [Doc. No. 1 at 9.] Furthermore, Petitioner states that prosecutors committed misconduct by stating Petitioner "asked about getting a gun" because Petitioner only stated he "wished he had a gun" in a laughing manner. (Id. at 11.) Petitioner also claims instances of misconduct stating the prosecutor referred to him as a "liar and trickster," with respect to his alleged

9

language barrier and Petitioner's crying during trial. As stated before, the prosecutors' comments although detrimental to Petitioner's defense, were based on reasonable inferences drawn from the evidence from which reasonable jurors could come to different conclusions. Petitioner fails to make a prima facie showing that the prosecution's arguments were fundamentally unfair or constituted anything other than fair comments on the state of the evidence. Therefore, Petitioner fails to show that he is entitled to habeas relief based on this claim. Accordingly, this Court recommends that Petitioner's claim for prosecutorial misconduct be **DENIED**.

### 2. Ineffective Assistance of Trial Counsel Claim

In ground two, Petitioner claims he received ineffective assistance of trial counsel because his defense counsel failed to establish a "reasonable defense" and investigate "all potential avenues of defense." [Doc. No. 1 at 24.] Petitioner asserts that his counsel should have argued temporary insanity, mental incompetence and heat of passion. (Id.) Petitioner further argues that defense counsel failed to adequately familiarize himself with Petitioner's case, failed to hire experts or subpoena witnesses on behalf of Petitioner, and was deliberately incompetent at trial. (Id.) Petitioner lists additional grievances throughout his Petition including: defense counsel only visited Petitioner approximately four times, defense counsel "refused to use an interpreter", defense counsel refused to discuss pros and cons of Petitioners case, and lastly, the defense counsel "tried to convince Petitioner into just pleading guilty." (Id. at 25-26.)

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." Strickland v.Washington, 466 U.S. 668, 687 (1984). The first prong of Strickland requires a petitioner to show "that counsel's representation fell below an objective standard of reasonableness... under prevailing professional norms." Strickland, 466 U.S. at 688. In applying

1  Strickland, counsel is presumed to "have rendered adequate assistance and made
2  all significant decisions in the exercise of reasonable professional judgment." Id. at
3  690. The Court emphasized that "[a] convicted defendant making a claim of
4  ineffective assistance must identify the acts or omissions of counsel that are alleged
5  not to have been the result of reasonable professional judgment. The court must
6  then determine whether, in light of all the circumstances, the identified acts or
7  omissions were outside the wide range of professionally competent assistance."
8  Strickland, 466 U.S. at 690.

9      Here, Petitioner claims that "defense counsel chose the heat of passion
10 defense without properly and adequately investigating, and establishing this heat of
11 passion defense theory, with evidence, experts, or witnesses." [Doc. No. 1 at 25.]
12 Petitioner also asserts defense counsel "failed to contest issues" and did not
13 explore alternative lines of defenses such as temporary insanity, mental
14 incompetence and "heat of passion." (Id. at 23.) In doing so, Petitioner contradicts
15 his earlier claim that the "heat of passion" defense was chosen without proper and
16 adequate investigation. (Id. at 25.) This Court proceeds assuming that defense
17 counsel chose to establish a "heat of passion" defense.

18     In light of the entire trial record the heat of passion defense, that was chosen,
19 is completely reasonable given the fact that it would mitigate Petitioner's murder
20 charge to manslaughter.[1/] Petitioner urges that alternative defenses should have
21 been argued such as temporary insanity and mental incompetence however
22 Petitioner fails to make a prima facie showing that he was insane at the time he
23 pushed or shoved the victim from the balcony. As the superior court transcripts
24 reflect, Petitioner explained that he acted out of rage because his ex-girlfriend
25 refused to give their relationship another chance. (Lodgment 13 at 9-11.)

26
27
28     1. Under relevant part of 18 U.S.C.S. § 1112 "(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds: Voluntary–Upon a sudden quarrel or heat of passion." (18 U.S.C.S. § 1112(a))

Notwithstanding Petitioner's statements that he was taking a diet medication that made him 'edgy,' or that some 'evil spirit' took over him, this Court does not find that trial defense counsel's performance fell below an objectively reasonable level for not pursuing a claim of insanity.

In presenting evidence to satisfy the first prong of <u>Strickland</u>, Petitioner makes bare assertions, not a prima facie showing of deficient performance that was objectionably unreasonable in light of the facts and circumstances that were presented at the time of trial. Petitioner fails to "[show] that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment." (<u>Strickland</u>, 466 U.S. at 687.) Rather, Petitioner engages in a hindsight evaluation of the strategic and reasonable choices of defense counsel at the time of trial. Therefore, Petitioner fails to satisfy the first prong of <u>Strickland</u> and the Court need not address the second prong. <u>Rios v. Rocha</u>, 299 F.3d, 796, 805 (9th Cir. 2002). Accordingly, this Court recommends that Petitioner's claim for ineffective assistance of trial counsel be **DENIED**.

### 3. Unlawful Interrogation Claim

In ground three, Petitioner alleges his interrogation was unlawful because he claims he was mentally insane and not competent to invoke his Miranda rights, specifically, his right to counsel and to remain silent. [Doc. No. 1 at 35.] Petitioner states that he told the detectives that he formerly took "psych drugs", had seen a "mental doctor" and was taking a "diet pill." (<u>Id.</u>) Petitioner claims this should have "alerted the detectives that Petitioner was not in a state of mind . . . . to flex his Miranda." (<u>Id.</u>) Petitioner asserts he told the detectives the diet pills were making him "edgy" and that he felt an "evil spirit" had possessed him. (<u>Id.</u>)

The test to determine the voluntariness of a defendant's confession under federal law is the "totality of the circumstances." <u>Withrow v. Williams</u>, 507 U.S. 680, 693-94 (1993). Furthermore, under <u>Oregon v. Elstad</u>, 470 U.S. 298, 304-05 (1985), "[t]he Fifth Amendment is not 'concerned with moral and psychological

pressures to confessions emanating from sources other than official coercion."

Here, Petitioner maintains that he was "formerly taking a psych drug" and a diet pill that made him "feel edgy." [Doc. No. 1 at 35.] Petitioner communicated these concerns to the officers and claims in his Petition that the detectives had "an obligation to have him seen by a doctor first, before interrogating him." (Id.) The record indicates that the Petitioner was provided Miranda warnings and proceeded to impliedly waive them and communicate. [Doc. No. 11 at 23.] Petitioner does not provide evidence and the record is void of any government coercion. Rather, Petitioner seeks to claim that he was mentally incompetent because he had depression issues[2], and was taking a diet pill that made him "feel edgy." [Doc. 18 at 30-43.] While Petitioner may not have been in the most ideal mind set at the time of interrogation, that fact, without more, does not rise to a level that offends the U.S. Constitution. Accordingly, this Court recommends that Petitioner's claim for unlawful interrogation be **DENIED**.

### 4. Ineffective Assistance of Appellate Counsel Claim

In ground four, Petitioner contends that his appellate counsel was ineffective for failing to "raise all potential meritorious claims" on his behalf. [Doc. No. 1 at 47-51.] On appeal, counsel contended the trial court erred in admitting testimony by one of Petitioner's coworkers, violating his right to due process and a fair trial. (Lodgment 7 at 2.) Petitioner argues that his counsel refused to raise claims including judicial and prosecutorial misconduct, and ineffective assistance of counsel without properly investigating Petitioner's claims. (Id.)

In determining whether or not appellate counsel was ineffective, the

---

2. Petitioner attached consultation notes and forms from Kaiser Permanente- Department of Psychiatry and Addiction Medicine. There, physician notes indicate that Petitioner may have alcoholic, anger and depression issues. However, there are no alarming indications or negative comments regarding Petitioner's mental health. [Doc. No. 18 at 30-43.]

Petitioner also references a Psychiatric Evaluation medical record from June 30, 2008. There his evaluation indicated that although Petitioner had some emotional issues, Petitioner did not suffer from any mental incapacitation or deficiencies. [Doc. 18 at 65-72.]

objectively reasonable standard of Strickland is again employed. Strickland, 466 U.S. 668 (1984). Where the ineffective assistance of counsel claim is based on appellate counsel's failure to raise viable issues, the petitioner must show that the "ignored issues [were] clearly stronger than those presented." Smith v. Robbins, 528 U.S. 259, 288 (2000). Courts must also determine whether there is a reasonable probability that, but for counsel's unprofessional errors, the petitioner would have prevailed on appeal. (Id. at 285.)

In this case, since this Court has found no merit to Petitioner's prosecutorial misconduct, ineffective assistance of trial counsel, or unlawful interrogation claims, Petitioner's appellate counsel was not deficient for failing to raise these issues on direct appeal. Kimmelman v. Morrison, 477 U.S. at 375, 381-82 (1986) (finding that to prove prejudice, a petitioner must show that there is a reasonable probability that the state appellate court would have reversed the trial court's decision); Smith v. Robbins, 528 U.S. at 285. The record also reflects that appellate counsel did correspond with Petitioner about this strategic course of action. [Lodgment 13 at 12.] Accordingly, this Court recommends that Petitioner's claim for inadequate appellate counsel be **DENIED**.

### 5. Evidentiary Hearing

Although Petitioner contends that an evidentiary hearing is required for his claims, there is no need to conduct an evidentiary hearing because all of Petitioner's claims lack merit. Tanner v. McDaniel, 493 F.3d 1135, 1147 (9th Cir. 2007) (determining that the district court did not abuse its discretion in refusing to grant an evidentiary hearing where all petitioner's claims lacked merit); see also Pinholster, 131 S. Ct. at 140 (indicating that federal court is not an alternative forum for trying facts and issues with respect to habeas petitions).

///
///
///

# IV. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, **IT IS HEREBY RECOMMENDED** that the Court issue an order: 1) approving and adopting this Report and Recommendation, 2) denying the Petition on its merits, and 3) directing that Judgment be entered **DENYING** the Petition for Writ of Habeas Corpus. Any party to this action may file written objections to this Report and Recommendation with the Court and serve a copy to all parties on or before **June 12, 2013**. The document should be captioned "Objections to Report and Recommendation." Any reply to the objections must be filed with the Court and served on all parties on or before **July 10, 2013**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal to the Court's order. Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED: **May 15, 2013.**

Peter C. Lewis
U.S. Magistrate Judge
United States District Court